IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KEITH JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-2143-JPO |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

## I.  Introduction

The undersigned U.S. Magistrate Judge, James P. O'Hara, presided over a six-day jury trial in this diversity case.  The jury returned a verdict in favor of the plaintiff, Keith Jones, and against the defendant, United Parcel Service, Inc. ("UPS").  The jury specifically found that defendant terminated plaintiff's employment in retaliation for filing a workers' compensation claim, and that in doing so defendant acted in a willful, wanton, or malicious manner.  The jury awarded plaintiff $630,307 in actual damages and $2 million in punitive damages (doc. 147).  Judgment has been entered accordingly (doc. 150).

The case is now before the court on defendant's motion for new trial pursuant to Fed. R. Civ. P. 59(a)(1) **(doc. 151)**, and defendant's renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) **(doc. 154)**.  Also before the court is plaintiff's motion to alter or amend the judgment, to add prejudgment interest to the back pay component of the jury's award of actual damages **(doc. 157)**.  The instant motions have been thoroughly

briefed (*see* docs. 152-53, 155-56, 158, 163, 168-69, 172-73, & 176).  The court is now ready to rule.

## II.  Background and Uncontroverted Facts

Plaintiff worked for defendant for eighteen years before he was terminated in 2004. From 1989 through October 6, 2003, plaintiff was employed as a package car driver, working out of the UPS facility on James Street in Kansas City, Kansas.  As a package car driver, plaintiff picked up and delivered packages to customers along a prescribed route. The essential functions of the job description state that a package car driver must be able to lift packages weighing up to seventy pounds.  During his employment, plaintiff was a member of and was represented by the International Brotherhood of Teamsters, which had a collective bargaining agreement ("CBA") with defendant.

Prior to 2003, plaintiff suffered several work-related injuries for which he filed for and received workers' compensation benefits.  These injuries caused him to take substantial time off from work.  He had a left shoulder injury in 1991 which required surgery, and right shoulder injuries in 1996 and 1999 which also required surgery.  Defendant was aware of these work-related injuries and the corresponding workers' compensation claims plaintiff filed.

On October 6, 2003, plaintiff sustained a left shoulder injury while working, which was sufficiently painful that he could not continue work.  That same day, plaintiff telephoned his supervisor to report the injury.  Plaintiff filed a workers' compensation claim relating to

his injury.

Gary A. Legler, D.O., a UPS company doctor, examined plaintiff in October 2003 after he injured his left shoulder.  On October 10, 2003, Dr. Legler referred plaintiff to Daniel J. Stechschulte, M.D., an orthopedic surgeon.  Plaintiff underwent physical therapy at the Spine and Extremity Rehabilitation Center from October 8, 2003 to December 4, 2003. Plaintiff had functional capacity examinations ("FCEs") on November 16 and December 4, 2003.

On December 4, 2003, Dr. Stechschulte released plaintiff from his care and imposed a permanent twenty-pound overhead lifting restriction and a permanent forty-five-pound chest-to-shoulder lifting restriction with the left upper extremity.  After Dr. Stechschulte imposed these permanent lifting restrictions, plaintiff was not allowed to return to work. That is, when plaintiff showed Dr. Stechschulte's restrictions to Don Lewick, defendant's labor manager, Mr. Lewick told plaintiff that he could not return as a package car driver.

Despite the above-described restrictions, plaintiff believed that, based on his past experience, additional therapy and the passage of time would help his shoulder improve, and thus he continued to do physical therapy and lift weights on his own at home.  By the end of January 2004, plaintiff believed he could meet the seventy-pound lifting requirement to perform his job as a UPS package car driver.

On February 3, 2004, plaintiff arranged to be examined by Michael Poppa, D.O.  Dr. Poppa concluded plaintiff was able to meet the lifting requirements for a package car driver,

and  he issued plaintiff a return to work release without any restrictions.  On or around February 3, 2004, plaintiff presented defendant with the release to return to work that he had received from Dr. Poppa.

On February 9, 2004, defendant directed plaintiff to return to the company doctor, Dr. Legler.  Plaintiff was examined by Dr. Legler who, as part of the examination, performed a lift evaluation.  Plaintiff had a normal examination, and Dr. Legler concluded plaintiff met UPS's lift requirements for package car drivers.  Dr. Legler then provided plaintiff with a release to return to work.

Plaintiff provided Dr. Legler's release to defendant.  Monica Sloan, defendant's Kansas district occupational health manager, contacted Dr. Legler regarding his initial recommendation. Ms. Sloan asked Dr. Legler to obtain Dr. Stechschulte's records and asked whether Dr. Legler would change his release.  When Ms. Sloan contacted Dr. Legler, she did not provide Dr. Legler with any documentation setting forth or stating the restrictions that had been placed on plaintiff by Dr. Stechschulte in December 2003.  In any event, after being contacted by Ms. Sloan, Dr. Legler changed his initial recommendation on or around February 9, 2004 regarding plaintiff's ability to return to work and imposed restrictions of "20 lb. overhead lift limit per ortho."   Dr. Legler did this without obtaining Dr. Stechschulte's records.  Nor did Dr. Legler do any further evaluation before changing his report.  After Dr. Legler's revised recommendation regarding plaintiff's ability to return to work was provided to defendant, plaintiff was not allowed to return to work.

After learning Dr. Legler had changed his report, plaintiff filed a grievance with the union pursuant to the CBA.  A grievance panel, made up equally of union and management representatives, determined that the parties were to abide by a third-party doctor procedure contained in the CBA.  This procedure provides that, if defendant's doctor and an employee's doctor disagree, defendant and the union must mutually agree on a third doctor whose decision is final and binding.  Significantly, the procedure also states that "[n]either the Employer nor the Union will attempt to circumvent the decision of the third (3rd) doctor and the expense of the third doctor shall be equally divided between the Employer and the Union."[1]  Defendant and the union selected Frederick A. Buck, D.O., as the third doctor.  Ms. Sloan, after learning from Mr. Lewick that Dr. Buck had been chosen, made plaintiff's appointment with Dr. Buck.

On May 21, 2004, Dr. Buck examined plaintiff and found he was strong, had a good grip, and good range of motion.  Dr. Buck recommended plaintiff undergo an FCE because it was Dr. Buck's belief that an FCE was the best way to determine plaintiff's actual abilities on that date.  Although plaintiff was willing to have the FCE that day, Dr. Buck explained to plaintiff that he was unable to perform an FCE in his office that same day.

To make arrangements for the FCE, Dr. Buck called Ms. Sloan within the next twenty-four hours.  Ms. Sloan told Dr. Buck that plaintiff could not have an FCE because he already had FCEs in November and December 2003.  Prior to being informed by Ms.

---

[1] Trial Ex. A, at 59.

Sloan, Dr. Buck did not know plaintiff had prior FCEs.  Ms. Sloan acknowledged at trial that, if plaintiff passed an FCE in February or May of 2004, he would have been allowed to go back to work for UPS.  In any event, Dr. Buck testified that Ms. Sloan directed him to base his evaluation solely on plaintiff's medical records and not his physical findings from his May 21, 2004 examination; in her testimony, Ms. Sloan denied giving Dr. Buck such an instruction.  But it is undisputed Dr. Buck ultimately based his conclusions on plaintiff's prior medical records and not his physical examination of plaintiff.  Dr. Buck's decision included the permanent restrictions imposed by Dr. Stechschulte, which prevented plaintiff from returning to work as a package car driver.

After learning of Dr. Buck's May 21, 2004 report and UPS's refusal to allow an FCE, plaintiff filed a second grievance with the union.  Before Mr. Lewick went to the grievance panel hearing, he told Ms. Sloan not to make any further contact with Dr. Buck.  In June 2004, the grievance panel again ruled that the third-party-doctor procedure should be followed.  Mr. Lewick then told Ms. Sloan plaintiff would see Dr. Buck again, but neither she nor anyone else in defendant's human resources department was to contact Dr. Buck or any other third doctor regarding their examinations.  Ms. Sloan did not talk to Dr. Buck after receiving his May 21, 2004 report.

As instructed, plaintiff went back to see Dr. Buck on August 17, 2004, and was willing to undergo an examination and an FCE.  Dr. Buck testified, though, that he did not know why plaintiff was there and refused to examine him.  Although Dr. Buck did not call

Ms. Sloan again, he assumed he was supposed to do a records review and continued to rely on Ms. Sloan's previous instructions.  On August 17, 2004, Dr. Buck prepared a second report based entirely on plaintiff's medical records that again incorporated Dr. Stechschulte's restrictions.

Clint Long, the union's business agent, informed plaintiff that the decision of the third doctor was final and binding on the union, defendant, and the employee.  Plaintiff did not file another grievance.  Shortly after Dr. Buck's second report was submitted in August 2004, defendant formally terminated plaintiff.  Prior to that, plaintiff's last day of work as a package car driver was October 6, 2003.  His temporary alternative work assignments for defendant ended in mid-November 2003.  Plaintiff received some temporary total disability income-related benefits through December 4, 2003.

Since plaintiff stopped working for defendant in November 2003, he has not applied for *any* position of employment, though defendant presented evidence he probably could have found comparable work.  In early 2004, plaintiff started a lawn care business.  Plaintiff had experience mowing lawns and providing other lawn care services and also owned law care equipment he could use in his new business.  Since he started the business, plaintiff has been continually involved in the business on a full-time basis.  He supplements his lawn care business by performing occasional remodeling work, snow removal services, and other lawn care services.  Although plaintiff's goal is to be physically active all fifty-two weeks of the year, he does have a little time off.  Plaintiff has gradually increased his number of customers

and his gross income.

III.   Defendant's Motion for a New Trial

A.     Procedural Standards

Pursuant to Fed. R. Civ. P. 59(a)(1)(A), the court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Motions for new trial are committed to the sound discretion of the trial court.[2]  They are generally regarded with disfavor and should only be granted with great caution.[3]  A "party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence."[4]

B.     Jury Instructions

Defendant first seeks a new trial based on the wording of certain jury instructions. Of course, "[t]he decision whether to give or exclude a particular jury instruction is committed to the sound discretion of the trial court."[5]  "In reviewing jury instructions, the court must determine if the instructions properly state the law and provide the jury with

---

[2] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir. 1993).

[3] *Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir. 1992).

[4] *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir. 1983).

[5] *Audiotext Commc'ns Network, Inc. v. US Telecom, Inc.*, No. 94-2395, 1996 WL 568839, at *5 (D. Kan. Sept. 4, 1996) (citing *City of Wichita v. U.S. Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996)).

ample understanding of the issues and the standards applicable."[6]  "The instructions must cover the issues presented by the evidence and accurately state law."[7]

The Tenth Circuit reviews jury instructions "as a whole de novo to determine whether they accurately informed the jury of the governing law."[8]  Faulty jury instructions require reversal in the Tenth Circuit when (1) substantial doubt exists whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial.[9]  Jury instructions do not need to be flawless, provided that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.[10]  To be reversible, any lack of clarity in an instruction must sufficiently prejudice a party.[11]

Defendant argues that Instruction Nos. 15 and 16 contained defective prefatory language that misled the jury.  Instruction No. 15 stated:

---

[6] *Crumpacker v. State*, No. 00-4044, 2004 WL 3186196, at *3 (D. Kan. Oct. 6, 2004) (citing *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir. 1988)); *see also Audiotext*, 1996 WL 568839, at *5 (citing *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1517 (10th Cir. 1995)).

[7] *Crumpacker*, 2004 WL 3186196, at *3 (citing *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir. 1992)).

[8] *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1140-41 (10th Cir. 2006) (*quoting Quigley v. Rosenthal*, 327 F.3d 1044, 1062 (10th Cir. 2002)).

[9] *Id.* at 1141 (*quoting Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002)).

[10] *Townsend*, 294 F.3d at 1237.

[11] *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1301 (10th Cir. 1998).

> <u>Provided</u> you find plaintiff is entitled to recover under
> Instruction No. 12, you are further instructed that Kansas law
> does not prohibit the termination of an employee who is unable
> to perform his work at the time of his discharge, even if the
> inability to work was due to a work-related injury.

Instruction No. 16 stated:

> <u>Provided</u> you find plaintiff is entitled to recover under
> Instruction No. 12, you are further instructed that the Kansas
> Workers' Compensation Act does not impose a legal duty on
> the employer to consider or find alternative employment for an
> injured employee who is unable to return to his former position
> at the time of his discharge.

Instruction No. 12 informed the jury of the basic elements of plaintiff's claim for retaliatory

discharge due to his filing of a workers' compensation claim.

Defendant argues the court's use of the above-described prefatory phrase "provided

you find" in Instruction Nos. 15 and 16 was materially misleading and confused the jury.

Specifically, defendant argues the prefatory language invited the jury to consider plaintiff's

termination without considering the non-retaliatory reasons, supported by Kansas law, for

the termination. Defendant argues the phrase improperly relegated Instruction Nos. 15 and

16 to consideration by the jury only after it had found against defendant under Instruction

No. 12, the verdict director. Defendant argues the principles in Instruction Nos. 15 and 16

should have been considered by the jury while they were considering whether plaintiff

should prevail under Instruction No. 12, but the language at issue instructed the jury that the

principles were not part of the analysis regarding whether defendant's reasons for

termination were pretextual. Defendant therefore concludes Instruction Nos. 15 and 16 were

treated as affirmative defenses to be considered only after a finding of liability, which

improperly shifted the burden to defendant to prove that its reason for plaintiff's termination

was not pretextual.  Significantly, however, defendant does not argue that Instruction Nos.

12, 15, or 16 misstated Kansas substantive law.

Instruction No. 1, in relevant part, stated:

> You should not single out any one instruction alone as
> stating the law in this case.  Rather, you should construe each of
> the instructions in light of and in harmony with the other
> instructions, and you should apply the instructions as a whole to
> the evidence.  The order in which the instructions are given has
> no significance and is no indication of their relative importance.

Defendant argues Instruction No. 1 did not remedy the alleged defective prefatory language

of Instruction Nos. 15 and 16.

Considering the instructions as a whole, and as was discussed at length during the

instructional conference with counsel in accordance with Fed. R. Civ. P. 51, the court is

firmly of the view that the instructions properly guided the jury in its deliberations.  As noted

above, Instruction No. 1 unequivocally told the jury not to single out any one instruction and

to construe the instructions in light of and in harmony with the others.  Further, Instruction

No. 1 specifically stated the order of the instructions had no significance and did not indicate

their relative importance.

Instruction Nos. 15 and 16 were not treated as affirmative defenses.  They did not

improperly shift the burden to defendant to prove its reason for terminating plaintiff was not

pretextual.  Instruction Nos. 15 and 16 do not place a burden on *either* party, and they were

to be considered in harmony with the other instructions, including, but not limited to, Instruction No. 12.  Simply stated, there is nothing in the record to support defendant's assertions in this regard.

Instruction Nos. 15 and 16 did not invite the jury to consider plaintiff's termination without considering defendant's non-retaliatory reasons behind it.  And even assuming for the sake of discussion that the prefatory language of Instruction Nos. 15 and 16 was somewhat unclear, the language did not sufficiently prejudice defendant such that a new trial is warranted.  That is, if the "provided you find" language was improper, the court believes the jury still understood the issues to be resolved and its duty to resolve them.

C.      Punitive Damage Determination

1.      Submission to and Determination by Jury

Defendant argues briefly it is entitled to a new trial because the court committed substantial error by giving Instruction No. 20 and posing Question Nos. 3 and 4 in the verdict.  More specifically, defendant asserts the court erred because plaintiff failed to make a submissible case regarding punitive damages.  Defendant then refers to the memorandum in support of its motion for judgment as a matter of law (doc. 155).  The court, therefore, will address whether plaintiff made a submissible case regarding punitive damages in Section IV(D) below in ruling defendant's motion for judgment as a matter of law.

But even aside from whether plaintiff's evidence was sufficient to sustain the punitive damage part of the jury's verdict, defendant argues it is entitled to a new trial because the

court erred by not reserving to itself the issue of the *amount* of punitive damages. Instruction No. 20 stated that punitive damages could be awarded if the jury found by a preponderance of the evidence (which had to be clear and convincing) that defendant acted in a willful, wanton, or malicious manner in terminating plaintiff's employment in retaliation for plaintiff exercising his rights under the Kansas Workers' Compensation Act. Instruction No. 20 also stated that the jury should consider five specific factors in assessing the amount of punitive damages if it decided such an award was appropriate. Question No. 3 in the verdict asked the jury whether defendant acted in a willful, wanton, or malicious manner in terminating plaintiff's employment in retaliation for filing a workers' compensation claim. If the jury answered in the affirmative, it was to proceed to answer Question No. 4, which asked what amount of punitive damages, if any, should be awarded to plaintiff.

Defendant argues Instruction No. 20 and Question No. 4 were improper because, under K.S.A. § 60-3702(a), the amount of punitive damages should have been decided by the court and not the jury. Section 3702(a) provides that the trier of fact shall determine whether punitive damages shall be allowed and, if so, then the court must determine the amount of such damages in a separate proceeding. The issue of whether the court or the jury should decide the amount of punitive damages was the subject of defendant's pretrial motion for a bifurcated trial with regard to punitive damages (doc. 115). The court denied defendant's motion in a written opinion filed on August 18, 2008 (doc. 124).[12] As it did in

---

[12] *Jones v. United Parcel Service, Inc.*, No. 06-2143, 2008 WL 388413, at *3 (D. Kan. August 18, 2008).

its pretrial motion, defendant reasserts its argument that the Kansas statutory scheme regarding punitive damages is substantive as opposed to procedural and therefore should have been followed during trial.

In a diversity case such as this one, the *Erie* doctrine calls for the court to apply Kansas substantive law and federal procedural law.[13]  In its August 18, 2008 order, the court recited the test for classifying a law as substantive or procedural for *Erie* purposes and will not repeat it here.[14]  Neither the Supreme Court nor the Tenth Circuit has provided guidance regarding whether § 3702(a) requires a federal judge, sitting in a diversity case, to determine the amount of punitive damages, or whether a jury should decide the amount.[15]

Some judges in the District of Kansas have found § 3702(a) to be substantive and therefore have not permitted juries to decide the amount of punitive damages. Unfortunately, those cases do not analyze or discuss their ultimate holding that § 3702(a)'s two-step procedure is substantive instead of procedural.[16]  Other judges in the District of Kansas have held that § 3702(a) is procedural and not controlling in a diversity case.  At least two judges in the District of Kansas have held that a litigant is entitled to have a jury determine the amount of punitive damages under the Seventh Amendment to the United

---

[13] *See Ayres v. AG Processing Inc.*, No. 04-2060, 2005 WL 1799261, at *3 (D. Kan. July 22, 2005) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)).

[14] *See* doc. 124, at 2-3.

[15] *Id.* at 4 (citing cases).

[16] *See id.* at 4-5 (citing cases).

States Constitution and Fed. R. Civ. P. 38.[17]  Significantly, none of the judges in the District

of Kansas who have held the two-step procedure in § 3702(a) as substantive have addressed

the Seventh Amendment as a potential impediment to their approach.

The court's August 18, 2008 order stated:

> [T]he undersigned judge, having reviewed all the foregoing
> authorities, concludes that the better reasoned approach is to
> treat § 3702(a)'s provision directing the court to determine the
> amount of any punitive damages to be awarded as merely
> reflective of state procedure and therefore not binding in a
> diversity action.  In this regard, for purposes of the requisite
> *Erie* analysis, the undersigned firmly believes that declining to
> apply the state statute would *not* make so much of a difference
> to the character or result of the litigation that it would unfairly
> discriminate against Kansas citizens.  Further, the undersigned
> is wholly unpersuaded that declining to apply the bifurcated
> procedure in the state statute would have so important an effect
> upon the fortunes of one or both of the litigants in this case that
> it would likely cause future plaintiffs to choose the federal court
> over state court.  Very simply, although it fair to say that many
> believe that juries are far more likely than judges to go
> overboard and render "big" punitive damage awards, and
> although that hypothesis is not without appeal, *nothing* has been
> placed before this court to advance let alone support that
> hypothesis.  Indeed, depending on the background of the judge
> and further depending on the jury pool for a given case in
> federal court in Kansas, it is at least possible that some judges
> might be inclined to punish a defendant more than some juries.
> Substantial punitive damage awards by judges in this district
> who use the two-step procedure in K.S.A. § 60-3702(a) are by
> no means unprecedented.  *See, e.g.*, *Burton v. R.J. Reynolds
> Tobacco Co.*, 205 F. Supp. 2d 1253, 1265 (D. Kan. 2002)
> (Lungstrum, J.), *rev'd*, 397 F.3d 906, 914 (10th Cir. 2005).[18]

---

[17] *See id.* at 5-6 (citing cases).

[18] *Id.* at 6-7.

The court maintains its previous holding that § 3702(a)'s two-step determination is state procedure, such that it should not have been followed at trial.  Defendant incorrectly asserts that Kansas courts have held § 3702(a) to be constitutional; as earlier indicated, the cases upon which defendant relies do not mention, let alone analyze, whether § 3702(a) must give way to the Seventh Amendment.  The court also rejects defendant's argument that Kansas cases and the legislative intent in enacting § 3702 demonstrate that the requirement for the court to determine punitive damages is substantive and not procedural.  The very limited legislative history provided by defendant, including that the Kansas legislature intended to accomplish material tort reform, does not analyze whether the court determining the amount of punitive damages violates the Seventh Amendment or is substantive as opposed to procedural under *Erie*.  The court therefore declines to grant defendant a new trial on the basis that the jury determined the amount of punitive damages.

2.      Admission of Evidence Regarding Punitive Damages

Defendant argues it is entitled to a new trial because the court erred in admitting defendant's shareholders' equity figure from its Form 10-K for 2006 as filed with the Securities and Exchange Commission ("SEC").  At the close of plaintiff's case-in-chief, over defendant's objection, plaintiff's counsel read into evidence defendant's shareholders' equity figure from the Form 10-K.[19]  When this was done, the court specifically instructed the jury not to consider the figure with regard to liability but to only use it in determining the amount

---

[19] Trial Ex. 38.  The figure was read from this exhibit, but the exhibit was not admitted into evidence.

of punitive damages *if* the jury found defendant to be liable and that punitive damages were appropriate.

Defendant argues that evidence of its financial condition was improper because plaintiff had not made a submissible case of punitive damages at the close of his case-in-chief.  As earlier indicated, court will address the issue of whether plaintiff made a submissible case of punitive damages in Section IV(D) below.  Given the above ruling regarding § 3702(a), the court rejects defendant's argument that the financial condition of defendant should have only been considered by the court, as opposed to the jury, in determining the amount of punitive damages.

Defendant also argues that plaintiff should not have been able to use the Form 10-K because it was not disclosed as an exhibit for use at trial until January 28, 2008, after discovery closed and the court entered the final pretrial order (but still more than six months before trial).  On February 5, 2008, defendant objected to plaintiff's use of the Form 10-K in its objections to plaintiff's final witness and exhibit list.[20]

The morning of plaintiff's final day of his case-in-chief (August 21, 2008), the court held a conference with counsel outside the jury's presence to discuss plaintiff's plan to use the Form 10-K, among other issues.  Defendant asserted its above-stated objection that the form was not disclosed as an exhibit until after discovery ended.  In making its objection pursuant to Fed. R. Civ. P. 37(c)(1), defendant stated it was *not* claiming surprise by the late-

---

[20] Doc. 65, at 2.  Plaintiff's final witness and exhibit list identified the Form 10-K as exhibit 73.  Doc. 50, at 17.

disclosed exhibit.

The court recognizes defendant's argument that admission of the high shareholders' equity figure was far from harmless. However, defendant has failed to argue, in the instant post-trial motion or at trial, that it was plaintiff's late disclosure that caused the harm. And of course it must be kept in mind that the late disclosure was of defendant's own publicly filed document. The court therefore again finds plaintiff's late disclosure of the Form 10-K was harmless and therefore insufficient to exclude the evidence under Rule 37(c)(1).

Defendant also argues that plaintiff provided no evidence regarding defendant's financial condition other than a single large and ambiguous number labeled as shareholders' equity. Defendant argues the figure was confusing and misleading without an expert's explanation of the meaning of the term "shareholders' equity." Defendant argues the admission of the Form 10-K figure inflamed the jury's passion such that it became blinded by the large monetary amount and regarded defendant with prejudice.

Conspicuously, defendant has not cited any case that supports the proposition that an expert's explanation of the shareholders' equity figure was necessary. Defendant correctly notes that, if helpful to the trier of fact in understanding evidence, a properly qualified expert witness *may* testify thereto.[21] And of course a court may use its discretion and rule expert testimony inadmissible if such testimony is offered on an issue that a jury is capable of

---

[21] Fed. R. Evid. 702.

assessing for itself.[22]  For example, in *Hayes v. Wal-Mart Stores, Inc.*, the court granted the defendants' motion to exclude expert testimony that a punitive damage award equal to or less than dividends paid would financially punish but not irreparably harm the defendants.[23] The court found that the proposed expert testimony would not be helpful to the jury and would invade the province of the jury.[24]

The court rejects defendant's argument that the jury absolutely required the assistance of expert testimony to properly consider the meaning of the term "shareholders' equity" and the monetary sum expressed.  The court need not decide if such testimony may have been admissible but simply finds it was not required.

Plaintiff claims that a corporation's shareholders' equity is equivalent to a corporation's net worth, which is evidence of a defendant's financial condition and therefore directly relevant to the determination of punitive damages to be awarded.  Defendant argues that shareholders' equity does not always equal net worth.  That may be correct, but generally shareholders' equity is equivalent to net worth.[25]

Defendant concludes that the jury needed a more detailed understanding of the term

---

[22] *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994).

[23] 294 F. Supp. 2d 1249, 1250-51 (E.D. Okla. 2003).

[24] *Id.* at 1251.

[25] *Bolt v. Merrimack Pharm., Inc.*, No. Civ. S-04-0893WBSDAD, 2005 WL 1458722, at *4 (E.D. Cal. June 17, 2005); *see also Orjias v. Stevenson*, 31 F.3d 995, 1014 (10th Cir. 1994) (noting that an award was "less than 0.2% of the net worth (stockholders' equity)").

"shareholders' equity" to know defendant's net worth.  But, presumably the result of an informed tactical decision, defendant declined to present (or even proffer) any such more detailed evidence during trial.  In any event, the court rejects defendant's argument. K.S.A. § 60-3702(b)(6) lists "the financial condition of the defendant" as a factor to consider in determining the amount of punitive damages to be awarded.  It does not require that only defendant's net worth be considered.  Defendant's shareholders' equity clearly is some evidence of defendant's financial condition, and defendant does not argue otherwise.  For the reasons stated above, the court declines to grant defendant a new trial on the basis its shareholders' equity figure from its Form 10-K was presented to the jury.

D.     Verdict Against the Weight of Evidence

The court, as mentioned earlier, has the discretion to grant a new trial if a verdict appears to be against the weight of the evidence.[26]  But as a general rule the court must be mindful not to usurp the role of the jury and must exercise its discretionary power only in exceptional circumstances where the verdict was clearly against the weight of the evidence.[27] "A new trial is not warranted simply because the court would have reached a different verdict."[28]  A party seeking to set aside a jury verdict, "bear[s] the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight

---

[26] *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir. 1995).

[27] *Rivera v. Rivera*, 262 F. Supp. 2d 1217, 1230-31 (D. Kan. 2003) (citation omitted).

[28] *Hillman v. U.S. Postal Serv.*, 169 F. Supp. 2d 1218, 1222 (D. Kan. 2001) (citation omitted); *accord Boyce v. Bd. of County Comm'rs*, 857 F. Supp. 794, 797 (D. Kan. 1994).

of the evidence."[29]

Defendant argues plaintiff failed to show by a preponderance of the clear and convincing evidence the existence of a causal connection between his workers' compensation claim and his discharge.  Defendant also argues plaintiff failed to show by a preponderance of the clear and convincing evidence that defendant's stated legitimate, non-retaliatory reason for its decision to discharge plaintiff was merely a pretext for discrimination.  As the parties have done in some of their briefs, the court will address these arguments together.

Defendant argues plaintiff was terminated because his permanent medical restrictions rendered him incapable of performing the work for which he was hired.  Defendant states this determination was made by an orthopedic surgeon and through the third-party doctor procedure.  Defendant argues that plaintiff's "speculative" inference that his filing a workers' compensation claim caused his termination is insufficient to establish a causal connection, and further that the jury's verdict is clearly and overwhelmingly against the weight of the evidence.

Plaintiff responds by arguing that defendant continually sabotaged the medical evaluation process and insisted plaintiff's medical reports in February and May 2004 be based solely on outdated evaluations made in December 2003.  Plaintiff relies on evidence that shoulder strains sometimes heal over the course of two months and that patients should

---

[29] *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) (internal quotations and citation omitted).

be evaluated at any given time based on their current condition.

The evidence shows Ms. Sloan contacted the UPS company doctor, Dr. Legler, and asked if he would change his release, allowing plaintiff to return to work.  When contacted by Dr. Buck, the third doctor called for by the CBA, Ms. Sloan refused his request to perform an FCE and, at least as testified to by Dr. Buck, directed him to base his evaluation on plaintiff's past medical records instead of Dr. Buck's current physical findings.  Dr. Buck again relied on Ms. Sloan's instructions to base his report on plaintiff's medical records when plaintiff arrived for his second appointment in May 2004, and Dr. Buck therefore refused to examine plaintiff.

The court finds the jury's verdict was not clearly, decidedly, or overwhelmingly against the weight of the above-described evidence.  The record adequately supports the jury's implicit finding that plaintiff's efforts to return to his job and to follow the third-party-doctor procedure were wrongfully interfered with by defendant.

Further, evidence was presented that defendant's alleged nondiscriminatory reason for terminating plaintiff, i.e., that plaintiff was placed on permanent lifting restrictions by Dr. Stechschulte, was pretext for retaliation.  Most importantly, the evidence indicates that defendant refused to consider any  physical evaluations of plaintiff beyond December 2003, despite evidence that plaintiff continued physical therapy on his own and that shoulder injuries sometimes heal.  The evidence also indicates defendant interfered with the third-party-doctor procedure by Ms. Sloan's refusal to permit a more current FCE that would

reflect plaintiff's lifting abilities at the time. The evidence therefore supports a finding that defendant prevented proper evaluation of plaintiff's ability to return to work.

Defendant also argues it is entitled to a new trial because the award of punitive damages to plaintiff was against the weight of the evidence. Specifically, defendant argues plaintiff failed to prove by the clear and convincing evidence that defendant acted with willful conduct, wanton conduct, fraud, or malice, and that defendant authorized or ratified such conduct. Defendant argues Ms. Sloan's contact with Drs. Legler and Buck does not support the jury's award of punitive damages because it was not extraordinary misconduct. Defendant classifies Ms. Sloan's refusal of Dr. Buck's request for an FCE as a mistake regarding the third-party-doctor procedure that would at worst be classified as negligence.

Plaintiff relies on the evidence of Ms. Sloan's repeated interference with plaintiff's medical evaluations. Ms. Sloan asked Dr. Legler to change his release and later refused Dr. Buck's request for an FCE.

K.S.A. § 60-3702(c) provides that "[i]n any civil action where claims for . . . punitive damages are included the plaintiff shall have the burden of proving, by clear and convincing evidence . . . , that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." The evidence supports a finding that Ms. Sloan's conduct was at least wanton in nature. Ms. Sloan knew that with Dr. Stechschulte's restrictions in place, plaintiff would not be able to return to work. Ms. Sloan then prevented two other doctors from giving reports based on their opinions of plaintiff's current physical abilities. The

jury's finding that Ms. Sloan acted wantonly or maliciously is not against the weight of the evidence.

Section 3702(d)(1) provides that punitive damages may not be assessed against a "principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer."  Defendant relies on testimony that, after Ms. Sloan's refusal to permit an FCE, she was instructed by Mr. Lewick not to contact any of the third doctors again.  Defendant argues that the only evidence the jury heard was that defendant did not authorize or ratify Ms. Sloan's conduct and instead instructed her not to make similar instructions in the future.

Plaintiff argues Ms. Sloan was an authorized agent for defendant and had authority to act on defendant's behalf in connection with all the actions she took.  Plaintiff also notes Ms. Sloan had been granted executive authority and she acted within that authority. Ms. Sloan was defendant's Kansas district occupational health manager and testified that she had contact with third doctors in the past.  Ms. Sloan testified that she did not decide plaintiff should not return to work but merely provided information to Jim Grover, the health and safety manager, regarding plaintiff's restrictions and that Mr. Grover made the ultimate decision.  Ms. Sloan also testified, however, that as far as she knew, she was the sole source of information to Mr. Grover regarding whether plaintiff should return to work.

The court finds that evidence was presented that Ms. Sloan's conduct was authorized

by defendant such that punitive damages could be assessed against defendant.  While this was a close case, the court finds the jury's verdict was not against the weight of the evidence. Defendant has not met its heavy burden of demonstrating the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence.

E.      Excessive Damages

Finally, defendant asserts it is entitled to a new trial because the jury awarded excessive damages.  "[I]n a diversity case, 'state law provides the appropriate rules of decision for the district court to determine whether the verdict was excessive.'"[30] "Although a jury's determination of damages is ordinarily held in high esteem, the damages cannot be too conjectural and speculative to form a sound basis for measurement."[31]  Damages do not, however, have to be established with absolute certainty.[32]

The jury awarded plaintiff $216,895 in back pay, $393,412 in front pay (i.e., future lost wages), and $20,000 in compensatory damages, for a total of $630,307.  The jury also awarded plaintiff $2 million in punitive damages.[33]  Defendant argues each damages award was excessive.

---

[30] *In re Universal Serv. Fund Tel. Billing*, No. 02-1468, 2009 WL 435111, at *8 (D. Kan. Feb. 20, 2009) (quoting *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003)).

[31] *Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 86 (Kan. 1991).

[32] *Id.*

[33] Doc. 147, at 2-3.

1.      Actual Damages

Defendant argues the front pay award is flawed due to unreasonable speculation. Plaintiff testified he planned to work for UPS until age 56 before retiring.  Plaintiff's retained expert economist, John Ward, Ph.D., however, projected plaintiff's future earnings as if he had remained with defendant through age 67.  As acknowledged by defendant, it appears the jury reduced plaintiff's front pay to reflect retirement at age 56.  Dr. Ward's report had tabular information that would allow the jury to readily determine the front pay award based on several retirement ages for plaintiff, including age 56 and age 67.[34]  The court does not find the front pay award speculative based on Dr. Ward's having calculated future earnings through age 67.

Defendant argues plaintiff failed to mitigate his damages and the jury and Dr. Ward failed to offset a reasonable amount of earnings in the back and front pay awards that plaintiff could have earned with effort to find a job making more than he did doing lawn care work.  It is uncontroverted that plaintiff did not apply for any other truck driver  positions after his employment with defendant.  Defendant presented evidence through its retained vocational expert, Denise Reilly, that such jobs were available in 2004, 2005, and 2006 that plaintiff could have obtained. The court, however, rejects defendant's argument that, by demonstrating appropriate positions were available for which plaintiff was qualified but did not apply, defendant showed conclusively plaintiff's failure to mitigate his damages.

---

[34] Trial Ex. 45, at 6.

"The duty to mitigate damages is not an unlimited one; an injured party is bound only to exert reasonable efforts to avoid damage; his duty is limited by the rules of common sense."[35] Whether plaintiff took reasonable efforts to mitigate his damages is a question for the jury.[36] Plaintiff started a lawn care business in early 2004, which he continued to develop in terms of customers and income. Even Ms. Reilly acknowledged that businesses take time to build. Defendant has not provided any legal authority for the proposition that plaintiff must have attempted to seek employment in the same field as defendant or employment through another employer as opposed to being self-employed to mitigate his damages. The jury was entitled to find, and evidently did find, that plaintiff's lawn care business constituted a reasonable effort to avoid damages, and the evidence supports such a conclusion.[37]

2.    Compensatory Damages

Plaintiff testified that, following his termination by UPS, he was embarrassed and humiliated because he did not have enough money to provide for his family and had to rely

---

[35] *Steele v. J.I. Case Co. & W. Implement Co., Inc.*, 419 P.2d 902, 911 (Kan. 1966).

[36] *See id.*

[37] The court notes there was substantial evidence presented, largely unchallenged, suggesting plaintiff fairly easily could have found work at about the same rate of pay with one of the UPS's competitors. Accordingly, the trial judge would not have been surprised by a jury verdict of no damages (or nominal damages) on plaintiff's back and front pay claims. But, as earlier indicated, it was for the jury to decide whether going to work for FedEx or another UPS competitor was necessary for plaintiff to make "reasonable efforts" to mitigate his damages. Evidently the jury believed not.

on family and friends for economic support.  Plaintiff's testimony was corroborated by his wife.  Plaintiff did not seek any professional treatment for mental anguish, humiliation, or embarrassment suffered based on his termination.  In any event, defendant argues that, had plaintiff applied for and accepted alternative employment, he could have avoided this distress.

The court rejects defendant's argument that plaintiff should have applied for alternative employment and thereby mitigated his emotional damages.  As stated above, the court does not find that a new trial is warranted because plaintiff failed to mitigate his actual damages.  The court similarly finds a new trial is not warranted given plaintiff's alleged failure to mitigate his emotional damages.  The jury's award of $20,000 in compensatory damages based on emotional harm caused by the retaliatory discharge is supported by the record.

###    3.    Punitive Damages

Defendant argues that, even if plaintiff presented a valid claim for punitive damages, the amount of damages awarded to plaintiff are so excessive that they could only have resulted from the passion and prejudice of the jury and cannot be reconciled with due process standards.  Defendant evidently believes the jury failed to follow Instruction No. 20.  In pertinent part, and without objection by defendant, this instruction stated that the following factors were to be considered by the jury in assessing the amount of punitive damages:  (1) the likelihood at the time of defendant's misconduct that serious harm would result; (2) the

degree of defendant's awareness of that likelihood; (3) the duration of the misconduct (and any intentional concealment of it); (4) defendant's attitude and conduct upon discovery of the misconduct; and (5) defendant's financial condition.  Instruction No. 20 further specifically stated: "Any award of punitive damages must be fixed with calm discretion and sound reason, and must never be awarded, or fixed in amount, because of any sympathy, or bias, or prejudice with respect to any party to the case."

Unlike defendant, the court is disinclined to assume the jury ignored Instruction No. 20.  Regardless, the Tenth Circuit has noted that the Supreme Court instructs lower courts to use three guideposts in determining whether a punitive damages award is grossly excessive:  (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases.[38]  UPS does not specifically argue that the jury's $2 million punitive damage award is grossly excessive on the basis of any of these three guideposts.

The thrust of UPS's post-trial argument is that, because the ratio between the punitive damage award and the compensatory damage award is more than 3:1, the punitive ward simply does not comport with due process.  Specifically, citing certain language from the Supreme Court's decision in *State Farm*, defendant argues that, even assuming plaintiff's

---

[38] *Haberman v. The Hartford Ins. Group*, 443 F.3d 1257, 1271-72 (10th Cir. 2006) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996), and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

evidence was deemed sufficient to submit the issue of punitive damages to the jury, due process requires the $2 million punitive award in this case be reduced to $630,307, to reflect a 1:1 ratio to the jury's award of actual and compensatory damages for back pay, front pay, and emotional harm.  In this regard, defendant places great emphasis on the Supreme Court's statement that: "When compensatory damages are substantial, . . .  a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."[39]   But significantly, and as even UPS acknowledges, the Supreme Court qualified this statement as follows: "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."[40]

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[41]   The Supreme Court has articulated five factors for courts to consider in determining the reprehensibility of a defendant's conduct: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether

---

[39] 538 U.S. at 425.

[40] *Id.*

[41] *BMW*, 517 U.S. at 575.

the harm was the result of intentional malice, trickery, or deceit, or mere accident.[42]

The existence of one of the five factors mentioned immediately above weighing in favor of the plaintiff may not be sufficient to sustain a punitive damages award.[43]  And along the lines of what UPS argues, "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."[44]

Here, most of the harm to plaintiff was economic, in that 97% of the actual and compensatory damages award related to back pay and front pay.  But as earlier indicated, the jury also awarded plaintiff $20,000 for emotional harm, which of course is not an inconsequential amount even though it represented only 3% of the non-punitive award.  Although there is evidence of defendant interfering with plaintiff's medical evaluation process (and in turn plaintiff's economic interests), no evidence in this case suggests defendant was indifferent to or recklessly disregarded plaintiff's health or safety.  Plaintiff, the target of defendant's conduct, was financially vulnerable given that his wages from defendant represented his primary source of income.  Defendant's conduct was not an isolated incident; the evidence shows Ms. Sloan interfered with plaintiff's medical evaluation

---

[42] *State Farm*, 538 U.S. at 419.

[43] *Id.*

[44] *Id.*

process more than once.  The evidence indicates defendant's conduct was not mere accident.

Therefore, the five relevant factors, on balance, generally weigh in favor of plaintiff.

Of course, the measure of punishment must be both reasonable and proportionate to

the amount of harm to the plaintiff and to the general damages recovered.[45]  The Supreme

Court has declined to impose a bright-line ratio between harm to the plaintiff and the

punitive damages award.  However, few awards exceeding a single-digit ratio between

punitive and compensatory damages will satisfy due process.  An award of more than four

times the amount of compensatory damages might be close to the line of constitutional

impropriety.[46]  But the Supreme Court has stated that "single-digit multipliers are more likely

to comport with due process, while still achieving the State's goals of deterrence and

retribution, than awards with ratios in range of 500 to 1."[47]

Here, the jury's punitive damages award of $2 million is approximately 3.1 times the

jury's actual and compensatory damages award.  Under the unique facts presented in the case

at bar, the court finds this ratio, although on the high side, is not constitutionally excessive.[48]

Defendant also argues that, even if the court were to conclude defendant acted

---

[45] *Id.* at 426.

[46] *Id.* at 424-25.

[47] *Id.* at 425.

[48] *See, e.g.*, *Haberman v. The Hartford Ins. Group*, 443 F.3d 1257, 1271-72 (10th Cir. 2006) (upholding punitive damage award with 20-to-1 ratio to actual damages); *Hayes Sight & Sound, Inc. v. ONEOK, Inc.* 136 P.3d 428, 447-49 (Kan. 2006) (upholding punitive damages award with 3-to-1 or 6-to-1 ratio).

wantonly (as distinguished from committing intentional misconduct), that is an insufficient basis to support a punitive damage award constituting a multiple of the actual damages. Defendant, however, has provided no legal support for this argument.

Finally, defendant argues the jury's award of punitive damages was the result of passion and prejudice following the alleged erroneous admission of defendant's shareholders' equity value. The court has already ruled the admission of the shareholders' equity figure from defendant's 2006 SEC Form 10-K was proper. Defendant notes that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."[49] The court has found that the punitive damage award is not unconstitutional. The court therefore denies defendant's request for a new trial on the basis that the jury's damages awards were excessive.

## F.   Remittitur of Damages

Defendant requests that, if the court declines to grant a new trial, it should reduce the amount of the verdict to conform to the evidence. Defendant briefly argues there was insufficient evidence to award damages because plaintiff was unable to perform the essential functions of his job, and that the award of damages was not warranted because plaintiff failed to mitigate his damages. The court does not find the jury's damages awards should be reduced to conform to the evidence. The damages awards are sufficiently supported by the evidence.

---

[49] *Hayes*, 186 P.3d at 446.

IV.   Defendant's Renewed Motion for Judgment as a Matter of Law

A.   Procedural Standards

A post-trial motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) is appropriate only if the evidence, viewed in a light most favorable to the nonmoving party, "points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion."[50]  Such motions should be "cautiously and sparingly granted."[51]  In determining whether judgment as a matter of law is proper, the court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.[52]  Rather, the court must affirm the jury verdict if, viewing the record in a light most favorable to the nonmoving party, it contains evidence upon which the jury could have properly returned a verdict for the nonmoving party.[53]  Conversely, though, the court must enter judgment as a matter of law for the movant if "'there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law.'"[54]

[50] *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir. 2002) (quoting *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232. 1241 (10th Cir. 1991)).

[51] *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir. 2007) (quoting *Neese v. Schuckman*, 98 F.3d 542, 548 (10th Cir. 1996)).

[52] *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir. 2001) (citing *Lockard v. Pizza Hut*, 162 F.3d 1062, 1068 (10th Cir. 1998)).

[53] *Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219-20 (10th Cir. 1999) (citing *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996)).

[54] *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quoting *Harolds*, 82 F.3d at 1546-47).

B.      Elements of Claim of Retaliation in Violation of Public Policy

1.      Causal Connection

Defendant argues plaintiff did not establish a causal connection between his workplace injury and his discharge.  Plaintiff's ultimate burden is to show that his discharge was "based on" the exercise of his rights under the Workers' Compensation Act.[55] Defendant compares the instant case to the facts in *Rosas* and notes that here there is no evidence of comments made regarding the cost of workers' compensation claims or the hiring of a workers' compensation attorney.

Defendant relies on plaintiff being allowed to return to work following his previous shoulder injuries as evidence that no causal connection exists between the most recent workers' compensation claim and plaintiff's termination.  Defendant argues that because of the last injury, plaintiff simply could not fulfill his duties.  The court rejects this argument given the above-described evidence concerning defendant's actions interfering with plaintiff's medical evaluation process.

Plaintiff argues the evidence established a causal connection because a pattern of retaliatory conduct by defendant existed from the filing of plaintiff's workers' compensation claim up to the time of his termination, a close temporal proximity existed between plaintiff's filing his claim and his termination, he had satisfactory work performance and supervisory evaluations, and the individual who undertook the retaliatory actions was aware

---

[55] *Rosas v. IBP, Inc.*, 869 F. Supp. 912, 916 (D. Kan. 1994).

of plaintiff's filing of his claim.  Plaintiff filed his workers' compensation claim in October 2003, and the beginning of defendant's interference with the evaluation process began in February 2004.  Defendant's conduct continued with Ms. Sloan's denial of an FCE in May 2004.  Evidence was presented that plaintiff was a good, productive employee.  Ms. Sloan was aware of plaintiff's workers' compensation claim in 2003 and his prior claims in 1991, 1996, and 1999.  Further, although Ms. Sloan did not make the final decision to terminate plaintiff, she was the sole provider of information to that decision-maker.  The court finds this evidence, taken together and viewed in the light most favorable to plaintiff, was sufficient for the jury to find a causal connection existed.

      2.       Pretext

Defendant also argues plaintiff failed to establish its stated reason for terminating him was pretext for retaliation.  Defendant states that it terminated plaintiff in reliance on his permanent lifting restrictions and the third-party-doctor procedure.  Interestingly, defendant argues:

> While a jury could have inferred from Monica Sloan's actions in calling Dr. Legler and speaking to Dr. Buck that she was attempting to prevent Plaintiff from returning to work, it would be rank speculation for the jury to have inferred the reason for those actions was to retaliate against Plaintiff because he had filed a workers' compensation claim.[56]

The court, as it does in every case, instructed the jury that it could properly use direct or circumstantial evidence to find the ultimate facts from the evidence presented in the

---

[56] Doc. 155, at 15.

courtroom.  Instruction No. 4 stated that indirect or circumstantial evidence is "the proof of a chain of circumstances pointing to the existence or non-existence of certain facts." Instruction No. 4 also stated that the law makes no distinction between direct and circumstantial evidence but simply requires the jury find in accordance with the preponderance of all evidence in the case, both direct and circumstantial.

The court flatly rejects defendant's argument that an inference that Ms. Sloan simply was attempting to prevent plaintiff from returning to work was permissible, but that it would require speculation to infer her actions were in retaliation for plaintiff's filing of a workers' compensation claim.  Clearly, it was within the jury's province to draw *either* inference, or both (or, for that matter, neither).

The court agrees with plaintiff that the jury could have properly found defendant's stated reason for terminating plaintiff was a pretext for retaliation.  Defendant classifies plaintiff's argument that he was capable of performing his job and that permanent restrictions no longer existed as an exaggeration.  Defendant also attacks plaintiff's argument that Dr. Legler's and Dr. Buck's reports were not based on plaintiff's actual ability but rather on Dr. Stechschulte's opinions.  Although evidence was presented that Dr. Stechschulte was a respected expert regarding shoulder injuries, the evidence also shows Ms. Sloan twice interfered with plaintiff's medical evaluation process, including the purportedly neutral third-party-doctor procedure.  Defendant was never aware of plaintiff's present abilities after his appointment with Dr. Stechschulte, mostly because Ms. Sloan prevented further medical

assessment to be included in Dr. Legler's and Dr. Buck's reports.  The record therefore contains evidence from which the jury could properly conclude defendant's reason for plaintiff's termination was a pretext for retaliation.

C.      Mitigation of Damages

Defendant argues it is entitled to judgment as a matter of law on plaintiff's claims for lost wages, benefits, and compensatory damages because plaintiff failed to mitigate his damages.  Defendant states that plaintiff chose to continue performing lawn work he had done as a side job while employed by defendant.

For essentially the same reasons articulated in Section III(E)(1) above, the court does not find that plaintiff's efforts to mitigate his damages by starting his own business were unreasonable as a matter of law.  Defendant has not cited any authority that plaintiff must have applied for jobs with other employers to sufficiently mitigate his damages.  The jury could have properly concluded that plaintiff starting his own lawn care business was a sufficient effort to mitigate his damages.

D.      Submissible Case for Punitive Damages

1.      Willful or Wanton Conduct

Defendant argues that plaintiff failed to present any evidence to support the submission of punitive damages to the jury because there was no evidence from which a jury could find willful conduct, wanton conduct, fraud, or malice by clear and convincing evidence.  "Wanton conduct is an act performed with a realization of the imminence of

danger and a reckless disregard or complete indifference to the probable consequences of the act."[57]  Defendant argues plaintiff did not present evidence that Ms. Sloan's conduct was an effort to harm plaintiff or was done with an indifference to the ensuing consequences. Defendant relies on Ms. Sloan's testimony that she thought plaintiff should not work as a package car driver because to do so would be against his best interests medically.  Defendant describes Ms. Sloan's actions as merely informing Dr. Legler of plaintiff's permanent restrictions and refusing an FCE based on her mistaken belief of what was to be done in a third-party-doctor examination.  Plaintiff, though, describes Ms. Sloan's and defendant's conduct as deliberate interference that they knew would ultimately result in the final termination of plaintiff.

Here again, defendant conveniently chooses to ignore that the jury was free to use circumstantial evidence to reach its verdict.  Defendant argues Ms. Sloan did not realize the imminence of injury (i.e., wrongful termination of plaintiff) because of her actions, that she was not indifferent to the risk of wrongful termination of plaintiff, and that she did not refrain from taking steps to prevent injury because of her indifference.  But of course the jury had the opportunity not only to listen to what Ms. Sloan said on the witness stand, but just as importantly to how she said it – to observe her demeanor while testifying and to try to reconcile (to the extent possible) her testimony with the documentary evidence in the trial record and the testimony of other witnesses.  In this regard, with the agreement of both

---

[57] *Reeves v. Carlson*, 969 P.2d 252, 256 (Kan. 1998).

parties, and consistent with well-settled law, the jury was told in Instruction No. 25 that they were free to accept or reject all or any part of *any* witness's testimony.  Even assuming for the sake of discussion that the jury placed much stock in what Ms. Sloan testified to during the trial, defendant ignores there was circumstantial evidence which, viewed in the light most favorable to plaintiff, demonstrated that Ms. Sloan realized the imminence of plaintiff's wrongful termination and was indifferent to such a risk.  At a bare minimum, Ms. Sloan knew her actions would prevent plaintiff from returning to work, and the jury could properly find that she realized he would be terminated wrongfully and was indifferent to that probable consequence of her action.  Although she may not have been the ultimate decision-maker, Ms. Sloan testified that as far as she knew, she was the sole provider of information regarding whether plaintiff should be terminated.  There was a legally sufficient evidentiary basis for the jury to return a verdict finding Ms. Sloan and defendant acted wantonly.

      2.      Authorized or Ratified Conduct

Defendant argues it is entitled to judgment as a matter of law on the punitive part of the jury's verdict because the allegedly wrongful conduct by Ms. Sloan of which plaintiff complains was neither authorized nor ratified by the company.  In this regard, K.S.A. § 60-3702(d)(1) provides that punitive damages may not be assessed against a "principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer."  Authorization generally is accomplished before or during the employee's questioned

conduct, and it may be based on an express grant of authority or on a course of conduct indicating that the employee was empowered or given the right or authority to engage in the questioned conduct.  Ratification may be accomplished before, during, or after the employee's questioned conduct, and it may be based on an express ratification or based on a course of conduct indicating the approval, sanctioning, or confirmation of the questioned conduct.[58]  "[R]atification and authorization are broad enough to encompass evidence that . . . corporate defendants knew or should have known about employee misconduct and evidence of corporate policies, procedures, or managerial behavior that a jury reasonably could infer implicitly authorized or ratified the questioned conduct."[59]

Defendant argues that, in enacting § 3702(d), the Kansas legislature removed two bases on which employers previously could be liable for punitive damages due to an employee's tortious conduct: (1) that the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; and (2) that the employee was employed in a managerial capacity and was acting within the scope of employment.[60]  Plaintiff counters by pointing to a statement by the Kansas Supreme Court in a case decided after the enactment of § 3702(d) that "[a] corporation is liable for punitive damages for the

---

[58] *Smith v. Printup*, 866 P.2d 985, 1003 (Kan. 1993).

[59] *Id.* at 1005.

[60] *See Lindsey v. Miami County Nat'l Bank*, 984 P.2d 719, 723 (Kan. 1999).

tortious acts of a managerial agent acting within the scope of his or her employment."[61] Defendant argues that in *Flint Hills*, there was no issue of whether an employee's act needed to be ratified or approved because the chief executive officer was the person charged with the wrongful conduct and that therefore the case does not support plaintiff's position.

Notably, neither party has analyzed the Kansas Supreme Court's statement in *Flint Hills* that it was reviewing its decisions and legislative enactments that occurred between 1980 and 1984.[62]  Section 3702(d) and the related § 3701(d) were enacted after 1984. Defendant also failed to analyze how the chief executive officer being charged with the wrongful conduct did not require ratification or authorization by the corporation.  Further, defendant did not attempt to dispute the Kansas Supreme Court's unequivocal statement that a corporation is liable for punitive damages for the tortious acts of a managerial agent acting within the scope of her employment.

Defendant does not dispute plaintiff's argument that Ms. Sloan's acts of misconduct were within the scope of her employment as occupational health manager but, as stated above, disputes that it is a legally sufficient basis for the punitive damages award.  Indeed, defendant states that "Monica Sloan was employed in a managerial capacity and was acting within the scope of her employment when she called Dr. Legler and talked to Dr. Buck."[63]

---

[61] *Flint Hills Rural Elec. Co-op. Ass'n v. Federated Rural Elec. Ins. Corp.*, 941 P.2d 374, 380 (Kan. 1997).

[62] *Id.* at 377.

[63] Doc. 155, at 25.

Although the Kansas Supreme Court's analysis was somewhat limited in temporal scope, its statement that a corporation is liable for punitive damages for the tortious acts of a managerial agent acting within the scope of his or her employment has been followed in subsequent cases.[64]  The court therefore finds that Ms. Sloan acting in a managerial capacity and acting within the scope of her employment is a sufficient basis for defendant to be liable for punitive damages for her actions.

Nevertheless, in an abundance of caution, the court will proceed to analyze whether Ms. Sloan's actions were authorized or ratified by defendant.  Plaintiff notes that Ms. Sloan's responsibilities included managing and supervising all work-related injuries for defendant's employees throughout the state of Kansas, including the James Street facility where plaintiff worked.  Ms. Sloan had regular contact with company doctors regarding their evaluations of injured employees and extensive experience with the third-party-doctor procedure called for by the CBA.  Ms. Sloan had contact with third-party doctors in the past.  Ms. Sloan was the most senior member of defendant's management in charge of occupational health at the James Street facility.  Ms. Sloan had regular contact with both Dr. Legler and Dr. Buck.  Although she did not make the ultimate decision to terminate plaintiff, Ms. Sloan was involved in the decision and was the sole provider of information to Mr. Grover.

Plaintiff states that Instruction No. 21 properly informed the jury that punitive

---

[64] *See, e.g.*, *Holt v. Wesley Med. Ctr., LLC*, No. 00-1318, 2004 U.S. Dist. LEXIS 13814, at *37 (D. Kan. July 19, 2004); *Lowe v. Surpas Res. Corp*, 253 F. Supp. 2d 1209, 1256 (D. Kan. 2003).

damages could not be assessed unless the conduct was authorized or ratified and that the jury rejected defendant's argument that Ms. Sloan's conduct was unauthorized.  Authorization and ratification are broad enough to encompass evidence that defendant should have known about Ms. Sloan's misconduct and evidence of corporate policies, procedures, or managerial behavior that a jury reasonably could infer implicitly authorized or ratified the questioned conduct.  The court therefore rejects defendant's argument that evidence must have been presented that a more senior supervisor knew of Ms. Sloan's wrongful actions and expressly condoned them.  Here, given Ms. Sloan's management position and responsibilities, and her regular contact with doctors about their examinations, a jury could reasonably infer that she was implicitly authorized to contact Drs. Legler and Buck about their examinations.  Further, Ms. Sloan testified that no guidelines or directions existed with regard to a third-party doctor's examination.  The lack of any corporate policy may have implicitly authorized Ms. Sloan to contact third-party doctors to provide them her own directions.  The court finds, viewing the evidence in the light most favorable to plaintiff, that the jury could have properly found Ms. Sloan's actions were ratified or authorized by defendant.

## V.   Plaintiff's Motion to Alter or Amend the Judgment

Plaintiff requests that the court increase the $2,630,307 judgment by $41,454.58. Specifically, plaintiff asks the court to add prejudgment interest on the $216,895 back pay component of the jury's verdict for the time period of December 5, 2003 (the first day defendant prohibited plaintiff from working) through August 26, 2008 (the date of verdict).

"Generally, prejudgment interest is allowable pursuant to K.S.A. § 16-201 unless the claim for damages is unliquidated."[65] This standard deviates from the more lenient approach to awarding prejudgment interest on federal claims.[66] "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation."[67] "It is irrelevant that the underlying liability is disputed, so long as the amount of damages is certain."[68]

The court rejects plaintiff's reliance on cases purportedly holding that under Kansas law prejudgment interest is typically recoverable on an award of lost back pay and benefits in a wrongful discharge case.  All of the cases cited by plaintiff are distinguishable from the instant case in that the defendants therein did not dispute the amount of back pay or the propriety of prejudgment interest, or the courts therein applied the more lenient federal approach.

Plaintiff argues that his claim for back pay and benefits was a liquidated claim because it is uncontroverted he stopped receiving work-related income on December 4, 2003.  Plaintiff also relies on the testimony of his economist, Dr. Ward, as to how much plaintiff would have earned if he remained with defendant and how much he received from

---

[65] *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1280 (10th Cir. 2008).

[66] *Id.*

[67] *Kilner v. State Farm. Mut. Auto. Ins. Co.* 847 P.2d 1292, 1300 (Kan. 1993).

[68] *Hysten*, 530 F.3d at 1280.

alternative employment.

Unlike in *Hysten*, here defendant vigorously disputed the amount of plaintiff's back pay claim. Specifically, in addition to contesting the threshold liability issue of retaliatory discharge, UPS argued that plaintiff failed to mitigate his damages and that his back pay therefore should be reduced. Defendant also challenged when plaintiff could begin recovering back pay, arguing that plaintiff could not recover back pay while he was unable to work (which according to Dr. Poppa did not end until February 3, 2004). Plaintiff notably does not address this argument.

The court rejects plaintiff's argument that defendant's mitigation argument would only limit defendant's liability and does not constitute a dispute as to the amount of back pay owed to plaintiff. A possible failure to mitigate damages does not limit liability. Rather, it limits the amount of damages recoverable.

Dr. Ward was the only expert to testify regarding the amount of back pay. His testimony seemed fairly straight-forward and reliable. Indeed, Dr. Ward testified he had previously served as an expert in cases for defense counsel. It would *appear* the jury heavily relied on Dr. Ward's computations in making its award of both back pay and front pay. But, Dr. Ward's back pay calculation was by no means the *only* possible calculation of a back pay award. The award was not a fixed and certain award and is therefore unliquidated.

Given the above ruling, the court need not address whether plaintiff waived his claim to prejudgment interest by omitting it from the final pretrial order. The court denies

plaintiff's motion to amend the judgment to include prejudgment interest on the back pay award.

VI.    Conclusion and Order

This was a close case at trial, both on liability and damages.  Both parties were ably represented by outstanding trial lawyers, whom the court respects.  Although the court acknowledges the possibility that senior management at UPS subjectively and genuinely believed they did nothing wrong in terminating plaintiff's employment, the bottom line is that the trial record reasonably supports the jury's finding that defendant retaliated against plaintiff for filing a workers' compensation claim.  The jury's awards of damages, although on the high side (except, perhaps, for the modest $20,000 award for emotional harm), are sustainable given the record.  The punitive damage award, in particular, comports with the Supreme Court's recent pronouncements dealing with due process.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.    Defendant's motion for new trial (**doc. 151**) is denied.

2.    Defendant's renewed motion for judgment as a matter of law (**doc. 154**) is denied.

3.    Plaintiff's motion to alter or amend the judgment (**doc. 157**) is denied.

IT IS SO ORDERED.

Dated this 9th day of September, 2009, at Kansas City, Kansas.

_/s James P. O'Hara_____
James P. O'Hara
U.S. Magistrate Judge